# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MARTINEZ CASTILLO, | 1:11-CV-01289 LJO BAM HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| M. D. BITTER, Warden, | |
| Respondent. | |
| _____/ | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Tulare, following his conviction by jury trial on October 21, 2008, of four counts of premeditated attempted murder (Cal. Penal Code §§ 187a, 664), and one count of shooting at an inhabited dwelling (Cal. Penal Code § 246). (See Petition at 2.)  In a bifurcated proceeding, the jury determined that Petitioner had committed the offenses for the benefit of a criminal street gang.  (Id.)  The court also determined one firearm allegation to be true.  (Id.)  Petitioner was sentenced to serve an aggregate indeterminate term of

1

60 years to life in state prison. (Id.)

Petitioner filed a timely notice of appeal.  On July 26, 2010, the California Court of Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned decision.  (See Answer, Ex. A.)  On August 2, 2010, Petitioner filed a petition for rehearing in the Fifth DCA.  (LD[1] 4.)  The petition was summarily denied on August 3, 2010.  (LD 5.) Petitioner then filed a petition for review in the California Supreme Court.  (LD 6.)  The petition was summarily denied on September 29, 2010.  (LD 7.)

On August 4, 2011, Petitioner filed the instant federal habeas petition.  He presents the following claims for relief: 1) He claims his constitutional rights under the Sixth and Fourteenth Amendments were violated when the trial court erroneously denied the defense Batson/Wheeler motion; and 2) He claims his constitutional rights under the Fifth and Fourteenth Amendments were violated when the prosecution produced insufficient evidence that Petitioner acted to benefit a criminal street gang under Cal. Penal Code § 186.22(b).  On November 3, 2011, Respondent filed an answer to the petition.  On February 10, 2012, Petitioner filed a traverse along with a motion for evidentiary hearing and expansion of the record.  Respondent filed an opposition to the motion on February 22, 2012.

## STATEMENT OF FACTS

Petitioner and his co-defendant, Adan Castillo, who is also his brother, were charged with the same crimes and tried jointly.  (CT[2] 141-148.)  On appeal, Petitioner and his brother raised the same claims, but in separate appeals. (LD 1; LD 8.)  A formal statement of facts was not set forth by the appellate court in Petitioner's direct appeal; however, one was set forth in his co-defendant's appeal.  This Court hereby adopts the factual summary as provided in the co-defendant's appeal:

> Pauline Torres was waiting for friends outside an apartment complex in Porterville, when defendant and his brother, codefendant David Martinez Castillo (collectively, defendants), drove up in a white Lincoln Town Car and accosted her. After Torres said no to their invitation to attend a party, defendants put their car in park and

---

[1]"LD" refers to the documents lodged by Respondent with his answer.

[2]"CT" refers to the Clerk's Transcript on Appeal.

said, "We ain't scared."

Around this time, Torres's friends returned and started arguing with defendants. One of Torres's friends, David Garcia, was required to register as a northern gang member and another, Andrew Campos, was known to associate with northerners.[FN3] During the argument, Campos called defendants "Scraps." This appeared to anger defendants, who peeled out in their car and said "Puro sur."

> FN3. Witnesses referred interchangeably to northern and Norteño, and southern and Sureño; however, they primarily referred to these rival Hispanic gangs by their English names.

Less than two minutes later, defendants drove back to the apartment complex and one of them started shooting at the group standing in front. The shooter repeated "Puro sur" a number of times during the shooting. Bullets struck and injured Garcia, Campos, Campos's brother, Alexander Campos, and Campos's nephew, Aaron. A .22-caliber bullet went through the wall of the apartment building and was found inside a tenant's mattress.

A week after the shooting, Alexander Campos took his brother to a drug testing center. As he was backing out, he saw defendants in their car. They were laughing and one of them put his fingers in the shape of a gun and acted like he was going to shoot Alexander again. Alexander had his daughter, daughter-in-law, and grandchildren, who were in the car with him, duck down and pulled into a nearby police station, where he spoke with a detective.

After obtaining a search warrant, the police searched defendants' residence and a white vehicle at the residence. A blue bandana was found folded neatly on the front seat of the vehicle. The police also found a .22-caliber revolver in a storage shed behind the backyard. At that time, defendants were questioned by a police detective. After waiving their rights, defendant admitted that he associated with southern gang members and his brother admitted that he was an active southern gang member.

Detective Mark Knox testified as a gang expert for the prosecution during the jury trial of the substantive offenses and during the separate court trial of the gang enhancements. During the jury trial, Detective Knox testified, among other things, that "scrap" is a "derogatory term that northern gang members have created for a southern gang member." He explained the term is "insulting to a southern gang member" and opined that, if someone were to call a southern gang member a "scrap," the southerner would "probably fight for the southern gang."

When asked what shouting the words "Puro sur" might mean, Detective Knox testified: "Poros is a slang term that Hispanic gang members use, whether it be north or south, for Porterville, because it's P-O-R-O-S. Sur is the Spanish word for south, S-U-R." After the prosecutor clarified the first word was "puros" not "poros," Detective Knox testified: "I'm not sure what puro means, but maybe south side. But I know that sur is absolutely, positively south." When again questioned about the the significance of the words "Puro sur," Detective Knox responded: "I would say that it would be somebody representing the southern Hispanic gang culture."

During the court trial of the gang enhancements, Detective Knox opined that both defendants were members of the southern gang. His opinion was based, in part, on reports that defendants had identified themselves as southerners during previous jail bookings. After being presented with two hypothetical scenarios based on the facts of this case, Detective Knox opined the crimes would benefit the southern gang and the individual gang members who committed the crimes.

In the defense case, defendants and other witnesses testified that defendants were somewhere other than the Porterville apartment complex at the time of the shooting. (LD 9.)

**DISCUSSION**

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Tulare County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.   Standard of Review

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70 (2003).  Under the AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1    28 U.S.C. § 2254(d); <u>Lockyer</u>, 538 U.S. at 70-71; <u>Williams</u>, 529 U.S. at 413.

2          As a threshold matter, this Court must "first decide what constitutes 'clearly established

3    Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71,

4    *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

5    Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

6    of the time of the relevant state-court decision." <u>Id.</u>, *quoting* <u>Williams</u>, 592 U.S. at 412. "In other

7    words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

8    principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>

9          Finally, this Court must consider whether the state court's decision was "contrary to, or

10   involved an unreasonable application of, clearly established Federal law." <u>Lockyer</u>, 538 U.S. at

11   72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may

12   grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

13   Court on a question of law or if the state court decides a case differently than [the] Court has on a

14   set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; <u>see also</u> <u>Lockyer</u>, 538 U.S.

15   at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

16   state court identifies the correct governing legal principle from [the] Court's decisions but

17   unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

18         "[A] federal court may not issue the writ simply because the court concludes in its

19   independent judgment that the relevant state court decision applied clearly established federal

20   law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id</u>. at 411.

21   A federal habeas court making the "unreasonable application" inquiry should ask whether the

22   state court's application of clearly established federal law was "objectively unreasonable." <u>Id</u>. at

23   409.

24          Petitioner has the burden of establishing that the decision of the state court is contrary to

25   or involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v.</u>

26   <u>Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

27   states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

28   state court decision is objectively unreasonable.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-

1    01 (9th Cir.1999).

2    AEDPA requires that we give considerable deference to state court decisions. "Factual

3    determinations by state courts are presumed correct absent clear and convincing evidence to the

4    contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a

5    factual determination will not be overturned on factual grounds unless objectively unreasonable

6    in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v.

7    Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to

8    findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett,

9    393 F.3d 943, 976-77 (2004).

10   III.    Review of Claims

11          A.  Batson/Wheeler Challenge

12          In his first claim, Petitioner alleges the trial court erred in denying his Batson/Wheeler[3]

13   challenge by failing to meaningfully evaluate the prosecutor's stated reasons under the third step

14   of the Batson test.

15          This claim was presented on direct appeal to the Fifth DCA which denied the claim in a

16   reasoned decision. (LD 1; Resp't's Ex. A.).  Petitioner then raised the claim to the California

17   Supreme Court. (LD 6.)  The California Supreme Court denied the claim without comment.  (LD

18   7.)  When the California Supreme Court's opinion is summary in nature, the Court must "look

19   through" that decision to a court below that has issued a reasoned opinion.  Ylst v. Nunnemaker,

20   501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the appellate court analyzed and rejected the

21   claim as follows:

22          Defendant contends the trial court erroneously denied Adan's *Wheeler/Batson*
             motion because comparative juror analysis reveals the prosecutor's race-neutral reasons
23          for excusing five Hispanic prospective jurors and one African-American prospective juror
             were pretextual.  Assuming without deciding defendant's claim was not forfeited by his
24          failure to join in Adan's motion below, we reject it on the merits.

25          The use of peremptory challenges to remove prospective jurors on the sole ground of
             group bias violates the right to trial by a jury drawn from a representative cross-section
26          of the community under article I, section 16 of the California Constitution (*Wheeler,
             supra,* 22 Cal.3d at pp. 276-277), as well as the equal protection clause of the Fourteenth

27

28          ────────────────
             [3]Batson v. Kentucky, 476 U.S. 79 (1986); People v. Wheeler, 22 Cal.3d 258 (1978).

                                                    6

Amendment to the United States Constitution (*Batson, supra,* 476 U.S. at p. 89; *People v. Burgener* (2003) 29 Cal.4th 833, 863 (*Burgener* )). "A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing that one or more jurors [have] been excluded on the basis of group or racial identity.... Once a prima facie showing has been made, the prosecutor then must carry the burden of showing that he or she had genuine nondiscriminatory reasons for the challenges at issue. [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 993.) At that point, the trial court must decide whether the opponent of the challenge has proved purposeful discrimination. (*People v. McDermott* (2002) 28 Cal.4th 946, 971 (*McDermott*).)

The trial court's ruling on this issue is reviewed for substantial evidence and with great restraint. (*McDermott, supra,* 28 Cal.4th at p. 971.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*Burgener, supra,* 29 Cal.4th at p. 864.) In carrying out this obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's nondiscriminatory reason for exercising a peremptory challenge is being accepted by the court as genuine. This is particularly true where the prosecutor's nondiscriminatory reason for exercising a peremptory challenge is based on the prospective juror's demeanor, or similar intangible factors, while in the courtroom. (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.)

At the end of the first day of jury selection in this case, defense counsel made a *Wheeler/Batson* motion on the ground the prosecutor improperly used three of six peremptory challenges to exclude Hispanic prospective jurors. After finding a prima facie showing of discrimination had been made, the trial court invited the prosecutor to state his reasons for excluding these prospective jurors. The prosecutor explained he excused Prospective Juror No. 4 [FN4] because she had no prior jury experience and because she said her brother had recently been released from jail for a gang-related crime. Prospective Juror No. 2 was excused because he said his father and cousin were in jail. Prospective Juror No. 8 was excused because he said he had friends who had been arrested for attempted murder. After listening to the prosecutor's reasons, the trial court denied the *Wheeler/Batson* motion, finding "the prosecutor has race-neutral reasons for excluding those particular jurors."

FN4. For the sake of convenience and privacy, we refer to the excused jurors by their seat numbers.

On the second and final day of jury selection, after the prosecutor used eight more peremptory challenges to exclude prospective jurors, defense counsel renewed the *Wheeler/Batson* motion on the ground the prosecutor improperly used two peremptory challenges to exclude Hispanic jurors and one peremptory challenge to exclude an African-American juror. The trial court again found a prima facie showing had been made and asked the prosecutor to explain his reasons for excusing the jurors. The prosecutor explained he excused first Prospective Juror No. 14 because he said he had two brothers who had served prison terms. In response, the trial court stated: "Yeah, that was real clear to the Court that that wasn't based on race. The fact that he had two brothers that were involved in gangs, clearly any prosecutor wouldn't leave them on." As to Prospective Juror No. 1, the prosecutor explained: "[S]he said her dad was arrested. I feel her experience with her father and-well, the experience of her father and with the police might prejudice her with our witnesses." The court replied: "Yeah, I find a race-neutral reason to exclude her, also." As to the second Prospective Juror No. 14 excused, the prosecutor explained he excused the African-American juror because "she said she works

for a group home, and she also has family-I believe she said her family shot at people. I feel that might prejudice our case." [FN5] The trial court then noted she had been arrested and the prosecutor acknowledged this was another reason he had excused her. The trial court concluded: "Again, I don't think there's any prosecutor that's going to leave her on the jury panel, either, because of that background. So I find there is a race-neutral reason to exclude her."

> FN5. Specifically, second Prospective Juror No. 14 stated that she and her husband ran a "state parole group home," she had arrests in Tulare and Fresno Counties but "[e]verything has now been dismissed," and over 30 years ago she had distant cousins who were involved in a gang and shot and killed victims.

On appeal, defendant recognizes the prosecutor articulated nondiscriminatory reasons for excusing the prospective jurors in question, and that these reasons are supported by the record. He claims, however, the trial court committed reversible error by failing to evaluate meaningfully the prosecutor's explanations and simply accepting "at face value the prosecutor's proferred reasons as race-neutral[.]" Defendant also faults the court for failing to make "specific findings based on courtroom observations of juror demeanor or other percipient facts" and asserts that "several of the sworn jurors exhibited similar traits to those excused, including some with relatives who had been arrested/prosecuted and many who had never served on a jury before." Defendant concludes: "Had the court evaluated the prosecutor's responses in light of all the circumstances of the jury selection, it would have been clear that the proferred reasons were pretexts to excuse the five Hispanic jurors and the sole African-American juror."

On this record, we cannot agree with defendant's description of the trial court as "summarily" or "perfunctorily" denying the *Wheeler/Batson* motion.  Rather, the trial court's comments indicate it made a sincere and reasoned effort to evaluate the prosecutor's nondiscriminatory reasons for excusing the prospective jurors in question. Although not required to do so, the trial court made a number of *specific* comments detailing *facts* which supported the prosecutor's reasons for excusing the jurors and the trial court's finding they were genuinely race neutral.

Defendant's invocation of comparative juror analysis also fails to demonstrate the prosecutor's nondiscriminatory reasons for excusing the jurors were pretextual. Despite asserted similarities, a number of the sworn jurors defendant discusses also had characteristics the prosecutor could have reasonably viewed as potentially favoring the prosecution. For example, although sworn Juror No. 904128 said she had a brother who had been arrested, she also said she had a son-in-law who was a police officer and a niece who worked as a courtroom clerk in the same courthouse where defendants were being tried. In addition, she had watched her niece on television reading jury verdicts.

Juror No. 801205, a self-employed farmer, who disclosed that he had a family member involved in a similar criminal trial, expressed negative views of gang members, which likewise could have been construed as favorable to the prosecution. At one point, Juror No. 801205 stated: "Well, I don't like gangs and I don't like what they stand for. Like I said, I'm self-employed. If they worked for me, they wouldn't have enough time to go do drive-by's." Later, when asked about whether he might have a problem judging someone, Juror No. 801205 stated: "I don't necessarily, you know, judge people, but I mean, there's that little thing that goes behind your head when you see somebody with tattoos or earrings or anything else."

We have carefully reviewed the other comparisons urged by defendant and find none necessarily demonstrates purposeful discrimination by the prosecutor. We find, and defendant does not dispute, that the record contains substantial evidence supporting the

prosecutor's nondiscriminatory reasons for excusing the prospective jurors in question. Accordingly, we reject defendant's challenge to the trial court's rulings on his brother Adan's *Wheeler/Batson* motion.

(See Resp't's Answer, Ex. A.)

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. Purkett v. Elem, 514 U.S. 765, 767 (1995). First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. Id. If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. Id. At this second step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id., *quoting* Hernandez v. New York, 500 U.S. 352, 360 (1991). Finally, the third step requires the trial court to determine if the defendant has proven purposeful discrimination. And "[s]ince the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson, 476 U.S. at 98, n.21.

In this case, Petitioner contends that the prosecutor's reasons were pretextual. This allegation thus implicates Batson's third step, where the court evaluates whether the defendant has met the burden of showing purposeful discrimination in light of the proffered justifications. Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir.2006) (*en banc*); Batson, 476 U.S. at 98.

On the first day of jury selection, the prosecutor struck six jurors from the venire. Petitioner made a prima facie showing that the prosecutor excused three of the six jurors on the basis of race. The trial court stated that an inference was raised and asked the prosecutor to provide the reason for the dismissal. The burden then shifted to the prosecutor to provide a race-

neutral reason. The prosecutor stated that he excused Prospective Juror Gutierrez because she had never served on a jury before and because she stated her brother had been incarcerated for a crime. (CRT[4] 19-20.)  She admitted the crime was similar, and when asked if there was anything that would cause her concern in the this case, she stated, "Maybe 'cause it's a little fresh. It's - - it had to do with gang - - something having to do with gangs, as well." (CRT 20.)  The prosecutor stated he excused Prospective Juror Sierra, because his father was currently incarcerated and his cousin had been involved in a similar crime. (CRT 18.)  The prosecutor challenged Prospective Juror Anaya, because Mr. Anaya stated he had a few friends who had been arrested for the same charges of attempted murder. (CRT 22.)  The trial court denied the <u>Batson/Wheeler</u> motion finding the prosecutor had race-neutral reasons for excluding these jurors. (CRT 113.)

On the second day of jury selection, the prosecutor used eight more peremptory challenges.  The defense renewed the <u>Batson/Wheeler</u> motion based on the challenge to two prospective Hispanic jurors and one African-American juror.  The prosecutor stated he excused Prospective Juror Torres, because Mr. Torres had stated that his two younger brothers had served time in prison, one of them having been convicted of a similar gang-related crime. (CRT 121-122.)  When Mr. Torres was asked whether he could be fair, he stated, "Yeah, I guess." (CRT 122.)  Prospective Juror Ms. Torres stated her father had been arrested, and she stated she had no prior jury experience. (CRT 151.)  Prospective Juror Little stated she and her husband ran a state parole group home. (CRT 152.)  Ms. Little admitted that cousins of hers had been involved in a similar gang incident thirty years prior, and in that incident her cousins had shot and killed someone. (CRT 152-153.)  She also stated that ten to fifteen years ago, she had been held at gunpoint. (CRT 153.)

The trial court again found the prosecutor's reasons were race-neutral.  (CRT 165-166.)  The trial court also determined that the prosecutor's reasons were well-founded.  (CRT 166.)  The trial court stated that no prosecutor would leave some of the jurors on the panel based on their statements. (CRT 166.)  Nevertheless, Petitioner complains that comparative juror analysis

---

[4]"CRT" refers to the Corrected Reporter's Transcript on Appeal.

1  shows the prosecutor's explanations were only a pretext for racially-motivated reasons.

2      The appellate court determined that comparative juror analysis failed to demonstrate the

3  prosecutor's reasons were pretextual.  The court noted that although several sworn jurors had

4  similarities to the challenged jurors, the sworn jurors also had characteristics that were

5  potentially favorable to the prosecution.  For example, one sworn juror that had been arrested

6  also had a son-in-law who was a police officer and a niece who was a courtroom clerk in the

7  same courthouse where the defendants were being tried.  Another sworn juror who had disclosed

8  he had a family member who was involved in a similar criminal trial also stated he viewed gangs

9  negatively.  When that juror was questioned about his views, he stated: "Well, I don't like gangs

10  and I don't like what they stand for. Like I said, I'm self-employed. If they worked for me, they

11  wouldn't have time to go do drive-by's." (See Resp't's Answer, Ex. A.)  When asked about his

12  judgment, he stated: "I don't necessarily, you know, judge people, but I mean, there's that little

13  thing that goes behind your head when you see somebody with tattoos or earrings or anything

14  else." (See Resp't's Answer, Ex. A.)

15      On direct review, the trial court's determination regarding the prosecutor's proffered

16  reasons is entitled to "great deference," Batson, 476 U.S., at 98, n. 21, and "must be sustained

17  unless it is clearly erroneous." Snyder v. Louisiana, 552 U.S. 472, 477.  On federal habeas

18  review, "AEDPA 'imposes a highly deferential standard for evaluating state-court rulings" and

19  "demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, __

20  U.S. __, __, 131 S.Ct. 1305, 1307 (2011), quoting, Renico v. Lett, 559 U.S. __, __, 130 S.Ct.

21  1855, 1862 (2010).  In this case, the state appellate court decision was plainly not unreasonable.

22  The record did not reflect different treatment between comparably situated jurors.

23      Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a

24  decision that was contrary to, or involved an unreasonable application of, clearly established

25  Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

26  The claim should be denied.

27      B.   Insufficiency of Evidence of Criminal Street Gang Enhancement

28      In his second ground for relief, Petitioner claims the evidence was insufficient to support

1   the allegation that he committed the murder to benefit a criminal street gang.  He states the only

2   gang evidence came from a gang expert, and this evidence was insufficient to show he acted with

3   the specific intent and knowledge to benefit a gang.  Respondent alleges the claim is procedurally

4   defaulted and without merit.

5       Petitioner did not present this claim on direct appeal to the Fifth DCA. (LD 1.)  Rather, he

6   joined in the argument presented in his co-defendant's appeal.  (LD 1.)  The Fifth DCA

7   determined that Petitioner had waived the claim because he had failed to specify those portions

8   of his co-defendant's arguments that supported his appeal.  (See Resp't's Ex. A.)  Petitioner filed

9   a petition for rehearing where he included those specific references. (LD 4.)  However, the Fifth

10  DCA rejected the appeal in a silent denial. (LD 5.)  Petitioner then raised the claim in the

11  California Supreme Court, with the specific references, but the petition was summarily denied.

12  (LD 7.)  Where the "last reasoned decision" before the petition reaches the state's highest court

13  "explicitly imposes a procedural default," an unexplained denial from the state's highest court

14  presumptively does not represent a decision on the merits that lifts the default. Ylst, 501 U.S. at

15  803.  The Fifth DCA's determination that Petitioner had procedurally defaulted his claim was the

16  last reasoned decision; the claim was rejected as follows:

17          Finally, we decline to consider the challenge to the gang enhancements raised by
        Adan in his separate appeal (People v. Castillo, appeal No. F057335) FN6 as applicable to

18      defendant. Pursuant to California Rules of Court, rule 8.200(a)(5), defendant asserts that
        he joins in "the issues and arguments" raised by Adan "to the extent that they are

19      applicable to his case and accrue to his benefit." Although Adan does argue in his appeal
        that the evidence was insufficient to support the gang enhancements attached to each

20      count, his argument specifically addresses the evidence pertaining to him and does not
        apply to defendant or accrue to defendant's benefit. Indeed, one of Adan's arguments is

21      that imposition of the gang enhancements unfairly punished him for associating with
        defendant, his active gang-member brother.

22
23          FN6. We take judicial notice of the opening brief in that appeal. (Evid.Code, §§
        452, subd. (d), 459.)

24          We are not required to make an independent, unassisted study of the record to
        determine whether the evidence was sufficient to support the gang enhancements as to

25      defendant. Under California law, it is the duty of counsel to refer the reviewing court to
        the portion of the record that supports the appellant's contentions on appeal. If no citation

26      is furnished on a particular point, the reviewing court may treat it as waived. (Guthrey v.
        State of California (1998) 63 Cal.App.4th 1108, 1115.) Applying these principles here,

27      we find defendant has waived any challenge to the gang enhancements imposed against
        him.

28

1   (See Resp't's Answer, Ex. A.)

2        1.  Procedural Default

3        A federal court will not review a petitioner's claims if the state court has denied relief of

4   those claims pursuant to a state law that is independent of federal law and adequate to support the

5   judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Coleman v. Thompson, 501 U.S. 722,

6   729-30 (1989); See also, Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  A state court's

7   refusal to hear the merits of a claim because of petitioner's failure to follow a state procedural

8   rule is considered a denial of relief on independent and adequate state grounds.  Harris v. Reed,

9   489 U.S. 255, 260-61 (1989).  This doctrine of procedural default is based on the concerns of

10  comity and federalism. Coleman, 501 U.S. at 730-32.

11       There are limitations as to when a federal court should invoke procedural default and

12  refuse to evaluate the merits of a claim because the petitioner violated a state's procedural rules.

13  Procedural default can only block a claim in federal court if the state court "clearly and expressly

14  states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263

15  (1989).  For California Supreme Court decisions, this means the Court must specifically have

16  stated that it denied relief on a procedural ground.  Ylst v. Nunnemaker, 501 U.S. 797, 803

17  (1991); Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1993); Hunter v. Aispuro, 982 F.2d

18  344, 347-48 (9th Cir. 1991).  If the California Supreme Court denies a petitioner's claims without

19  any comment or citation, the federal court must consider that it is a decision on the merits.

20  Hunter v. Aispuro, 982 F.2d at 347-48.

21       In addition, a federal court may only impose a procedural bar on claims if the procedural

22  rule that the state used to deny relief is "firmly established and regularly followed."  O'Dell v.

23  Thompson, 502 U.S. 995, 998 (1991) (statement of Blackmun joined by Stevens and O'Connor

24  respecting the denial of certiorari); Ford v. Georgia, 498 U.S. 411, 423-24 (1991); James v.

25  Kentucky, 466 U.S. 341, 348-51 (1984).  The state procedural rule used must be clear,

26  consistently applied, and well-established at the time of the petitioner's purported default.  Fields

27  v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997); Calderon v. United States Dist. Court (Bean), 96

28  F.3d 112, 129 (9th Cir. 1996), cert. denied, 117 S.Ct. 1569.

1    In this case as set forth above, the appellate court rejected the claim on procedural

2  grounds because Petitioner had failed to comply with California Rules of Court § 8.204(a)(1)(C)

3  by specifying the portions of the record that supported his argument.  By failing to do so, under

4  California law the appellate court determined Petitioner had waived the claim.  California's

5  procedural rule that an appellate brief be supported by specific references to the record or

6  authority is consistently applied and is independent of federal law.  See Miller v. Superior Court,

7  101 Cal.App.4th 728, 743 (2002).

8    If the court finds an independent and adequate state procedural ground, "federal habeas

9  review is barred unless the prisoner can demonstrate cause for the procedural default and actual

10  prejudice, or demonstrate that the failure to consider the claims will result in a fundamental

11  miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501

12  U.S. at 750, 111 S.Ct. 2456; Park, 202 F.3d at 1150. In this case, Petitioner has not shown that

13  any external factor prevented him from specifically referencing the relevant portion of his co-

14  defendant's brief.  In addition, Petitioner does not demonstrate actual prejudice resulting

15  therefrom.

16    Petitioner has also failed to demonstrate that a fundamental miscarriage of justice will

17  occur if the claim is barred from federal review.  The miscarriage of justice inquiry is governed

18  by the standard set forth in Murray v. Carrier, 477 U.S. 478 (1986). Murray requires a habeas

19  petitioner to show that "a constitutional violation has probably resulted in the conviction of one

20  who is actually innocent." Id. at 496. To satisfy Murray's "actual innocence" standard, a

21  petitioner must show that, in light of new evidence, it is more likely than not that no reasonable

22  juror would have found him guilty beyond a reasonable doubt. Id. Here, Petitioner makes no such

23  showing of actual innocence.

24    Accordingly, Petitioner is procedurally barred from bringing this claim. In any case,

25  Petitioner's claim is without merit.

26    2.  Review of Claim

27    The law on insufficiency of the evidence claim is clearly established.  The United States

28  Supreme Court has held that when reviewing an insufficiency of the evidence claim, a court must

determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. <u>Id</u>. at 324 n.16. On federal habeas review, AEDPA requires an additional layer of deference to the state decision. <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir.2005). This Court must determine whether the state decision was an unreasonable application of the <u>Jackson</u> standard.

Pursuant to Cal. Penal Code § 186.22(b), "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" is punishable with an additional prison term. In this case, there was substantial evidence from which a rational jury could determine that Petitioner committed the attempted murder in association with a criminal street gang with the specific intent to promote, further, or assist his fellow gang members. Petitioner complains that the only gang evidence came from the opinion of the gang expert. His argument is not well-taken.

Petitioner admitted at trial that he was an active gang member. (RT[5] 377-378.) There was evidence that the shooting victims were members of the Norteno gang, and that Petitioner was a member of the Sureno gang. (RT 71, 294, 548.) There was evidence that gang slurs were traded back and forth between the victims and Petitioner and his co-defendant. (RT 221.) The victims called Petitioner and his co-defendant "scraps," which is a derogatory term Norteno gang members use for a Sureno gang member. (RT 221, 294-295, 300.) The record also shows that during the commission of the crime Petitioner and his co-defendant repeated the gang slur, "Puro sur," which is a term associated with the Sureno gang. (RT 87, 91-92, 289.) Petitioner had also admitted that his house had been shot at by members of the rival northern gang. (RT 437, 548.)

Therefore, Petitioner's arguments regarding the state of the evidence is not persuasive. The gang evidence did not consist solely of expert testimony. As set forth above, there was

---

[5]"RT" refers to the Reporter's Transcript on Appeal.

1    ample evidence apart from the gang expert's testimony from which a rational jury could find

2    beyond a reasonable doubt that Petitioner committed the offense in association with a gang with

3    the specific intent to promote, further, or assist his fellow gang members.

4         Petitioner argues his claim is supported by the opinion in <u>Briceno v. Scribner</u>, 555 F.3d

5    1069 (9th Cir. 2009), in which the Ninth Circuit stated that "section 186.22's gang enhancement

6    can only be applied when the defendant had the specific intent to facilitate gang members'

7    criminal activities other than the charged crime."  As noted by Respondent, however, the

8    California Supreme Court determined in <u>People v. Albillar</u>, 51 Cal.4th 47 (2010), that the Ninth

9    Circuit's interpretation of Cal. Penal Code § 186.22(b)(1) was wrong, and that "'the specific

10   intent to promote, further, or assist in any criminal conduct by gang members' is unambiguous

11   and applies to *any* criminal conduct, without a further requirement that the conduct be 'apart

12   from' the criminal conduct underlying the offense of conviction sought to be enhanced.'"

13   <u>Albillar</u>, 51 Cal.4th at 66 (emphasis in original).  Federal courts are bound by state court rulings

14   on questions of state law. <u>Oxborrow v. Eikenberry</u>, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*,

15   493 U.S. 942 (1989).  Therefore, <u>Briceno</u> does not aid Petitioner in his argument.

16        Petitioner fails to demonstrate that the state court's decision was "contrary to, or involved

17   an unreasonable application of, clearly established Federal law," or an "unreasonable

18   determination of the facts in light of the evidence."  The claim should be rejected. 28 U.S.C.

19   § 2254(d).

20   IV.    <u>Motion for Evidentiary Hearing and Expansion of the Record</u>

21        On February 10, 2012, Petitioner filed a motion requesting an evidentiary hearing in the

22   matter.  Petitioner argues an evidentiary hearing is necessary to resolve several alleged factual

23   issues.

24        As correctly argued by Respondent, Petitioner's motion is foreclosed by the Supreme

25   Court's decision in <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388 (2011).  In <u>Pinholster</u>, the Supreme

26   Court determined that a federal court's review of the claim is limited to the record that was before

27   the state court.  <u>Id</u>. at 1398.

28        Here, the Court has determined that Petitioner has failed to satisfy either prong of

1   § 2254(d) in light of the evidence before the state court. Therefore, federal evidentiary

2   development in support of these claims is unwarranted, and Petitioner's request should be

3   denied.  See, e.g., Kemp v. Ryan, 638 F.3d 1245, 1260 (9th Cir.2011).

4                                **RECOMMENDATION**

5          Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH

6   PREJUDICE.  The Court FURTHER RECOMMENDS that Petitioner's motion for evidentiary

7   hearing and expansion of the record be DENIED.

8          This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

9   United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and

10  Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of

11  California.  Within thirty (30) days after service of the Findings and Recommendation, any party

12  may file written objections with the court and serve a copy on all parties.  Such a document

13  should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

14  to the objections shall be served and filed within fourteen (14) days after service of the

15  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C.

16  § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time

17  may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

18  Cir. 1991).

19         IT IS SO ORDERED.

20  **Dated:   March 7, 2012                          /s/ Barbara A. McAuliffe**
                                                    UNITED STATES MAGISTRATE JUDGE